## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALVATORE LUPIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FERMI INC., TOBY NEUGEBAUER, MILES EVERSON, GRIFFIN PERRY, JACOBO ORTIZ, MARIUS HAAS, RICK PERRY, CORDEL ROBBIN-COKER, LEE MCINTIRE, UBS SECURITIES LLC, EVERCORE GROUP L.L.C., CANTOR FITZGERALD & CO., MIZUHO SECURITIES USA LLC, MACQUARIE CAPITAL (USA) INC., ROTHSCHILD & CO US INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, TRUIST SECURITIES, INC., BERENBERG CAPITAL MARKETS LLC, and PANMURE LIBERUM LIMITED,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Salvatore Lupia ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Fermi Inc. ("Fermi" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Fermi; and (c) review of other publicly available information concerning Fermi.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Fermi: (a) common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's October 2025 initial public offering ("IPO" or the "Offering"); and/or (b) securities between October 1, 2025 and December 11, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Fermi purports to be an energy and artificial intelligence ("AI") infrastructure company. The Company is structured as a real estate investment trust ("REIT"). The Company allegedly aims to build multiple, large scale nuclear reactors and create its own network of large, grid-independent data centers, powered by a mix of nuclear, natural gas, solar, and battery energy, targeted at artificial intelligence. The Company has no operating history or historical revenue. The Company's first project, Project Matador, purportedly aims to create the world's largest private energy campus, providing dedicated power for AI workloads.

3.    On October 1, 2025, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 37,375,000 shares of common stock at a price of $21.00 per share. The Company received net proceeds of approximately $745.7 million from the Offering. The proceeds from the IPO were purportedly to be used for general corporate purposes, including funding procurement and installation of long lead-time items and construction of long lead-time item, and the acquisition of, or investment in, technologies, solutions, or businesses that complement the business.

4.    On December 12, 2025, before the market opened, Fermi revealed the first tenant for the Company's anticipated Project Matador AI campus had terminated its $150 million Advance in Aid of Construction Agreement, which would have supplied construction costs for the facility.

5.    On this news, the Company's stock price fell $5.16 per share, or 33.8%, to close at $10.09 on December 12, 2025, on unusually heavy trading volume.

6.    By the commencement of this action, Fermi stock has traded as low as $8.59 per share, a 59% decline from the $21.00 per share IPO price.

7.    In the Registration Statement and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company overstated its tenant demand for its Project Matador campus; (2) the extent to which Project Matador would rely on a single tenant's funding commitment to finance the construction of Project Matador; (3) there was a significant risk that that tenant would terminate its funding commitment; and (4) as a result of the foregoing,

Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13.     Plaintiff Salvatore Lupia, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Fermi common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO and/or Fermi securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Fermi is incorporated under the laws of Texas with its principal executive offices located in Amarillo, Texas. Fermi's common stock trades on the NASDAQ under the symbol "FRMI."

15.     Defendant Toby Neugebauer ("Neugebauer") was, at all relevant times, the Chief Executive Officer ("CEO"), director, and co-founder of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant Miles Everson ("Everson") was, at all relevant times, the Chief Financial Officer ("CFO") and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.     Defendants Neugebauer and Everson (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public,

and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

18. Defendant Griffin Perry ("G. Perry") was a director of the Company and signed or authorized the signing of the Registration Statement filed with the SEC.

19. Defendant Jacobo Ortiz ("Ortiz") was a director of the Company and signed or authorized the signing of the Registration Statement filed with the SEC.

20. Defendant Marius Haas ("Haas") was named in the Registration Statement as a director nominee.

21. Defendant Rick Perry ("R. Perry") was named in the Registration Statement as a director nominee.

22. Defendant Cordel Robbin-Coker ("Robbin-Coker") was named in the Registration Statement as a director nominee.

23. Defendant Lee McIntire ("McIntire") was named in the Registration Statement as a director nominee.

24. Defendants Neugebauer, Everson, G. Perry, Ortiz, Haas, R. Perry, Robbin-Coker, and McIntire are collectively referred to hereinafter as the "Securities Act Individual Defendants."

25. Defendant UBS Securities LLC ("UBS Securities") served as an underwriter for the Company's IPO. In the IPO, UBS Securities agreed to purchase 8,450,000 shares of the Company's common stock, exclusive of the over-allotment option.

26. Defendant Evercore Group L.L.C. ("Evercore") served as an underwriter for the Company's IPO. In the IPO, Evercore agreed to purchase 6,175,000 shares of the Company's common stock, exclusive of the over-allotment option.

27.    Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") served as an underwriter for the Company's IPO. In the IPO, Cantor Fitzgerald agreed to purchase 6,175,000 shares of the Company's common stock, exclusive of the over-allotment option.

28.    Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter for the Company's IPO. In the IPO, Mizuho agreed to purchase 5,200,000 shares of the Company's common stock, exclusive of the over-allotment option.

29.    Defendant Macquarie Capital (USA) Inc. ("Macquarie") served as an underwriter for the Company's IPO. In the IPO, Macquarie agreed to purchase 975,000 shares of the Company's common stock, exclusive of the over-allotment option.

30.    Defendant Rothschild & Co US Inc. ("Rothschild") served as an underwriter for the Company's IPO. In the IPO, Rothschild agreed to purchase 1,300,000 shares of the Company's common stock, exclusive of the over-allotment option.

31.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the Company's IPO. In the IPO, Stifel agreed to purchase 975,000 shares of the Company's common stock, exclusive of the over-allotment option.

32.    Defendant Truist Securities, Inc. ("Truist") served as an underwriter for the Company's IPO. In the IPO, Truist agreed to purchase 650,000 shares of the Company's common stock, exclusive of the over-allotment option.

33.    Defendant Berenberg Capital Markets LLC ("Berenberg") served as an underwriter for the Company's IPO. In the IPO, Berenberg agreed to purchase 1,300,000 shares of the Company's common stock, exclusive of the over-allotment option.

34.     Defendant Panmure Liberum Limited ("Panmure") served as an underwriter for the Company's IPO. In the IPO, Panmure agreed to purchase 1,300,000 shares of the Company's common stock, exclusive of the over-allotment option.

35.     Defendants UBS Securities, Evercore, Cantor Fitzgerald, Mizuho, Macquarie, Rothschild, Stifel, Truist, Berenberg, and Panmure are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

36.     Fermi purports to be an energy and AI infrastructure company. The Company is structured as a REIT. The Company allegedly aims to build multiple, large scale nuclear reactors and create its own network of large, grid-independent data centers, powered by a mix of nuclear, natural gas, solar, and battery energy, targeted at artificial intelligence. The Company has no operating history or historical revenue. The Company's first project, Project Matador, purportedly aims to create the world's largest private energy campus, providing dedicated power for AI workloads.

### The Company's False and/or Misleading

### Registration Statement and Prospectus

37.     On September 30, 2025, the Company filed its final amendment to the Registration Statement with the SEC on Form S-11/A, which forms part of the Registration Statement. The Registration Statement was declared effective on the same day.

38.     On October 1, 2025, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 37,375,000 shares of common stock at a price of $21.00 per share.  The Company received net proceeds of

approximately $745.7 million from the Offering. The proceeds from the IPO were purportedly to be used for general corporate purposes, including, but not limited to, funding procurement and installation of long lead-time items and construction of long lead-time item, and the acquisition of, or investment in, technologies, solutions, or businesses that complement the business.

39.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

40.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

41.     The Registration Statement described the Company's purported expected use of proceeds from the IPO, including that the Company expects[1] "***[u]pon entering into a lease agreement***" that, "tenant prepayments" among other resources, to "***satisfy 100% of the funding for [] long lead-time items.***" The Registration Statement further described how the Company's "***resources are sufficient to satisfy our financial obligations for at least twelve months following the issuance of these consolidated financial statements***" due to "***planned near term funding sources, including tenant prepayments.***" Specifically, the Registration statement stated as follows, in relevant part:

> ***Upon entering into a lease agreement with a tenant, we expect project financing, tenant prepayments*** and the other sources of liquidity discussed in Management's Discussion and Analysis of Financial Condition and Results of Operations— ***"Liquidity and Capital Resources" to satisfy 100% of the funding for our long lead-time items.***

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

      \*            \*            \*

**Liquidity and Capital Resources**

***Liquidity and Going Concern***

Under ASC Topic 205-40, Presentation of Financial Statements—Going Concern, we are required to evaluate whether conditions or events raise substantial doubt about our ability to meet future financial obligations as they become due within one year after the consolidated financial statements are issued.

As of June 30, 2025, the Company had not generated any revenues and does not expect to generate revenues within the next twelve months. Tenant revenues are currently expected to commence in 2027; however, such revenues are not expected to be sufficient to fund the Company's full operating and capital requirements until Phase 4 of Project Matador is completed and operating at scale. Project Matador will require substantial capital investment to achieve commercial operation. ***To finance the construction and development of Project Matador during this period, we intend to raise capital through a combination of equity financings, including this offering, various debt issuances, and tenant prepayments.*** These financings are not certain to occur. See "*—Sources of Liquidity*" and "*—Planned Use of Capital*" below.

Based on our current operating plan and our available capital, we believe our resources are sufficient to satisfy our financial obligations for at least twelve months following the issuance of these consolidated financial statements. ***Our anticipated liquidity includes our existing cash balance, anticipated net proceeds from this offering, and planned near term funding sources, including tenant prepayments, project-level debt, and strategic equity capital.*** Our operating plan for the upcoming year is designed to align with capital sources that are either in hand or reasonably expected to be secured within that timeframe.

42.     The Registration Statement touted the Company's prospects for Project Matador, including that the Company was "***currently in the development and construction preparation stages,***" with "***assets under contract or in the final permitting or contracting stages.***" Specifically the Registration Statement stated as follows in relevant part:

**Project Matador**

Project Matador is a first-of-its-kind energy campus to be built to power the AI revolution. Project Matador is a multi-phased project designed to deliver up to 11 GW of behind-the-meter energy and support up to 15 million square feet of AI-ready hyperscale compute infrastructure by 2038. Fully developed, Project Matador

is expected to be one of the world's largest integrated nuclear-, natural gas-, and solar-powered data center developments.

We believe Project Matador's 5,236-acre site (the "Project Matador Site") is ideal for pursuing our mission as it is unique in its combination of attributes critical to the success of this type of development. The Project Matador Site is secured under the Lease, which provides Fermi with exclusive long-term development rights and potential public-sector coordination, which we believe will accelerate entitlement and permitting processes. ***We are currently in the development and construction preparation stages with several foundational engineering, utility infrastructure, and interconnection assets under contract or in the final permitting or contracting stages***. In addition, we are working diligently to satisfy all of the requisite conditions precedent contained in the Lease to enable Phase 1 development, as described in more detail below. See "*Business and Properties— Facilities—TTU Lease Agreement*."

43.    The Registration Statement touted the Company's progress in its development phase, including "Phase 0" which was targeted for completion by year end 2025, as follows in relevant part:

**Project Matador Development Phases**

We have designed Project Matador with optimal scalability for data center tenants and hyperscalers who are the focus of our planning process. Over time, Project Matador is designed to deliver up to 11 GW of total generation capacity to serve tenants' critical loads, with up to 15 million square feet of dedicated AI computing space. Development is organized into five main phases, some of which will occur concurrently:

•    **Phase 0:** We plan to establish critical external infrastructure to prepare the Project Matador Site for construction. ***During Phase 0, we plan to secure essential inputs, including an approximately 200 MW expected power supply from SPS, fiber connections, water services from the City of Amarillo, and large-scale natural gas delivery to support on-site energy needs as well as satisfaction of all conditions precedent under the Lease.*** See "*Business and Properties—Facilities— TTU Lease Agreement*." Additionally, we intend to construct a pad for our Siemens turbine units, build a campus road for operational access, and establish a laydown yard for critical equipment and asset storage. Phase 0 plans also include foundational groundwork for the initial development of 2.6 million square feet of data center capacity as well as assuring the Project Matador Site is fully equipped to support subsequent construction phases and the operational demands of our tenants.

*                    *                    *

10

The following presents in-depth descriptions of current plans for each of the planned five main development phases, from site preparation and initial development through construction and expansion of our nuclear reactors. These phases run concurrently with each other, and site preparation and third-party coordination across all phases has already commenced.

### Phase 0: Preparation of the Acquired Site (Targeted Completion Date: YE 2025)

Phase 0 is dedicated to laying the groundwork for Project Matador by connecting critical external infrastructure to the project site, including 200 MW expected power supply from SPS, fiber optic connections, water services from the City of Amarillo, and large-scale natural gas delivery to meet on-site energy demands.

In addition to bringing off-site infrastructure on-site, we intend to construct a pad tailored for our Siemens turbine units, build a campus road to provide operational access, and establish a laydown yard for the storage of critical equipment and assets. Additionally, we plan to conduct preparatory groundwork for the initial development of 2.6 million square feet of data center capacity. Our site preparation project is designed to ensure the Project Matador Site is primed for subsequent construction phases. Commencement of Phase 1 construction additionally requires us to obtain a notice to proceed from Texas Tech University and the Texas Tech University System and the conditions to obtaining the notice include, among other things, obtaining an executed lease with a hyperscaler tenant, receipt of all permits and approvals for Phase 1 construction, and securing unconditional funding and financing for Phase 1 construction. See "*Business and Properties—Facilities—TTU Lease Agreement.*"

44.    The Registration Statement touted the Company's high level of tenant demand, including that the Company had entered into a letter of intent with the "First Tenant" and that the Company was "*in advanced discussions with a select group of foundational anchor tenants.*" Specifically the Registration Statement stated as follows, in relevant part:

**Recent Developments**

***Tenant LOI***

***On September 19, 2025, we entered into the Tenant LOI with the First Tenant to lease a portion of the Project Matador Site on a triple-net basis for an initial lease term of twenty years, with four renewal terms of five years each.*** The Tenant LOI provides for phased delivery of over 1 GW of powered shell spread across 12 Tenant Facilities to be constructed by the Company. ***Additionally, the Company and the Tenant are negotiating a cost reimbursement agreement and prepayment as part of their ongoing negotiations.*** Any prepayment would be on a full recourse

basis and subject to clawback, amortized over six years as a credit to the First Tenant's rental payments.

*            *            *

**Tenant Demand & AI Market Fit**

The AI revolution is fundamentally constrained by one primary factor: power. Hyperscale data centers, those capable of training frontier AI models and supporting real-time inference across billions of devices, consume energy at unprecedented scale. We believe our tenants desire near term access and significant, consistent scale to expand into multi-year development. Industry experts agree the U.S. electric grid cannot meet projected demand. Power procurement delays, interconnection backlogs, and regulatory bottlenecks have made traditional data center expansion exceedingly difficult for next-generation AI workloads. Fermi's model intends to solve that bottleneck.

Our platform is purpose-built for the world's most demanding AI users, such as companies and governmental entities with immediate multi-gigawatt power needs, hyperscaler-grade redundancy requirements, and zero tolerance for latency or power outages. Project Matador is engineered to support multiple 1 GW-class tenants, each with customizable delivery pathways including a combination of dedicated natural gas turbines, solar arrays, and nuclear island configurations.

***Our model has already attracted multiple inbound requests for the power and facilities we are in the process of developing. We are in advanced discussions with a select group of foundational anchor tenants, including:***

•    AI model developers scaling multi-billion-parameter systems;

•    GPU manufacturers pursuing integrated compute and power co-location strategies; and

•    Next-gen cloud and sovereign AI providers seeking full-stack ownership of energy and compute campuses.

Phase 1 was reverse-engineered based on direct demand signals from AI buyers seeking deployment locations outside of traditional grid jurisdictions, where permitting timelines and utility constraints make near-term development prohibitive.

***On September 19, 2025, we entered into a letter of intent (the "Tenant LOI") with an investment grade-rated tenant (the "First Tenant") to lease a portion of the Project Matador Site on a triple-net basis for an initial lease term of twenty years, with four renewal terms of five years each.*** The Tenant LOI provides for phased delivery of over 1GW of powered shell spread across 12 separate powered shells (each, a "Tenant Facility") to be constructed by the Company. Additionally, the Company and the First Tenant are negotiating a cost reimbursement agreement and

prepayment as part of their ongoing negotiations. Any prepayment would be on a full recourse basis and subject to clawback, amortized over six years as a credit to the First Tenant's rental payments.

45.    The Registration Statement purported to warn of risks which "could" or "may" negatively impact the Company, including that the Company had "***not yet constructed our facilities or entered into any binding contracts with any tenants***" and only " entered into a single letter of intent." Specifically the Registration Statement purported to warn as follows in relevant part:

> ***We have not yet constructed our facilities or entered into any binding contracts with any tenants, and there is no guarantee that we will be able to do so in the future. Our limited commercial operating history makes it difficult to evaluate our prospects, the risks and challenges we may encounter and our total potential addressable market. Any delays or setbacks we may experience could have a material adverse effect on our business, financial condition and results of operations, and could harm our reputation.***

> Our business plan to construct and operate Project Matador depends on, among other things, our ability to negotiate and enter into binding agreements with potential tenants to lease our facilities. If no potential near-term tenant enters into such binding agreement with us, our planned construction and operation of Project Matador could be significantly delayed. Such delays would result in delays in revenue and could hinder our ability to gain market traction with other potential tenants and/or trigger an early termination right of the landlord under the Lease. Additionally, there are conditions to the commencement of our Lease, including the termination or expiration of certain leases in existence at the Project Matador Site, satisfaction of all existing encumbrances, receipt of a surface waiver with respect to certain mineral rights in existence at the Project Matador Site, obtaining financing for the Phase 1 buildout, and the execution and delivery of a term sheet for our first tenant.

> *            *            *

> ***We may not achieve tenant adoption at the pace or pricing levels required for financial viability.***

> ***Although we are actively negotiating with prospective tenants, we have entered into a single letter of intent*** and have largely only received expressions of interest from what we believe are AI ecosystem leaders and there is no guarantee these entities will execute leases with us or maintain full occupancy under our pricing assumptions. Additionally, tenants often have significant bargaining power and may demand capital support, infrastructure rebates, or operational guarantees that

may increase our costs or reduce our profitability. A failure to achieve tenant adoption at an adequate pace and at assumed pricing levels may have a material adverse impact on our business prospects, financial condition, results of operations and cash flows.

***We will initially derive substantially all of our revenue from the lease with the First Tenant contemplated by the Tenant LOI we entered into on September 19, 2025.*** We anticipate that the Lease with the First Tenant and any leases we enter into with other tenants will contain certain milestones and conditions precedent that, if we are unable to meet, could result in significant liquidated damages or termination of the lease agreements, which would subject us to significant losses and have a material adverse effect on our business prospects, financial condition, results of operations and cash flows.

46.     The Registration Statement was materially false and misleading and omitted to state: (1) the Company overstated its tenant demand for its Project Matador campus; (2) the extent to which Project Matador would rely on a single tenant's funding commitment to finance the construction of Project Matador; (3) there was a significant risk that that tenant would terminate its funding commitment; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading**

**<u>Statements Issued During the Class Period</u>**

47.     The Class Period begins on October 1, 2025. On that day, Fermi's common stock began publicly trading pursuant to the Registration Statement, including the statements identified in ¶¶37-45.

48.     On November 10, 2025, Fermi issued its shareholder letter announcing its financial results for the third quarter ended September 30, 2025 (the "3Q25 Shareholder Letter"). The 3Q25 Shareholder Letter touted the Company's "investment grade letter of intent" with its first tenant, including that "***[i]n November, the parties entered into a $150 million Advance in Aid of Construction Agreement*** "which establishes a cost reimbursement framework under which the

*tenant will fund a portion of shared infrastructure and utility systems in advance of occupancy."*

Specifically the shareholder letter stated as follows, in relevant part:

### <u>Tenants - Investment Grade LOI</u>

On September 19, 2025, Fermi America executed an LOI with an investment grade-rated tenant to lease a portion of the Project Matador campus on a triple-net basis for an initial term of twenty years, with four additional five-year renewal options. The agreement contemplates the phased delivery of more than one gigawatt of powered shell capacity across twelve separate powered shell facilities to be constructed by the Company. ***In November, the parties entered into a $150 million Advance in Aid of Construction Agreement (see Recent Developments). which establishes a cost reimbursement framework under which the tenant will fund a portion of shared infrastructure and utility systems in advance of occupancy.*** While the Tenant LOI remains non-binding and subject to customary conditions, it represents an important step toward securing long-term tenancy for Project Matador and validating market demand for Fermi's large-scale, energy-integrated AI infrastructure platform.

*         *         *

**Recent Developments** Since the start of the fourth quarter, we have continued to drive our ambitious agenda forward, executing with focus and momentum across every dimension of the Project Matador development. ***We are advancing critical infrastructure, securing long lead-time items, deepening strategic partnerships, and progressing negotiations with our first tenant as we transition from planning to full-scale implementation.*** The following milestones highlight the tangible progress achieved as we position Fermi America for major construction and initial operations in 2026.

### • <u>Tenants - Advance in Aid of Construction Agreement</u>

In November 2025, Fermi America executed a $150 million Advance in Aid of Construction (AIAC) Agreement with its first prospective tenant at Project Matador. ***The AIAC establishes a cost reimbursement framework under which the tenant will fund a portion of shared infrastructure and utility systems in advance of occupancy. This agreement marks a pivotal milestone in Fermi's commercial program,*** strengthening alignment with the prospective tenant and advancing the parties toward execution of a long-term campus lease.

49.     The 3Q25 Shareholder Letter also reported the Company's purported financial results as follows, in relevant part:

| | For the three months ended September 30, 2025 | For the period from January 10, 2025 (Inception) through September 30, 2025 |
|---|---|---|
| **Expenses:** | | |
| General and administrative | $       37,776 | $        43,463 |
| Total expenses | 37,776 | 43,463 |
| **Loss from operations** | (37,776) | (43,463) |
| **Other income (expense):** | | |
| Interest income (expense), net | 12 | (669) |
| Other income (expense) | (309,048) | (309,048) |
| Total other income (expense) | (309,036) | (309,717) |
| **Net loss** | $     (346,812) | $      (353,180) |
| **Net loss per share – basic and diluted** | $         (0.84) | $          (0.95) |
| Weighted average shares outstanding – basic and diluted | 466,493,415 | 416,237,306 |
| **Stockholders' equity** | | |
| Common stock | | 575 |
| Preferred stock | | - |
| Additional paid-in capital | | 301,898 |
| Accumulated deficit | | - |
| Total stockholders' equity | | 302,473 |
| **Total liabilities and stockholders' equity** | | $      502,766 |

                *                    *                    *

50.     On November 10, 2025, Fermi published its investor presentation concerning its financial results for the third quarter ended September 30, 2025. The Investor Presentation touted the Company's purported milestone achievements, as follows, in relevant part:

16



51.     On November 12, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC (the "3Q25 10-Q"). The 3Q25 10-Q affirmed the previously reported financial results. The 3Q25 10-Q stated the following regarding the purported details of the Company's "*First Tenant Advance in Aid of Construction Agreement,*" including as it factored into the Company's "*principal sources of liquidity*" as follows in relevant part:

**First Tenant Advance in Aid of Construction Agreement**

On November 4, 2025, the Company executed a $150 million AIAC with its first prospective tenant at Project Matador. The AIAC establishes a cost reimbursement framework under which the tenant will fund a portion of shared infrastructure and utility systems in advance of occupancy.

*                    *                    *

Our principal sources of liquidity are expected to include:

●      Net Proceeds from our IPO: We intend to use a portion of the net proceeds from the IPO to fund early-stage infrastructure investments, including site mobilization, nuclear licensing, turbine procurement, and the initial wave of data center shell construction. These investments support foundational project elements required to unlock additional strategic capital and advance our Project Matador milestones.

●      *Tenant Prepayments: We expect a significant portion of our contracted revenue base to come from investment-grade tenants, many of whom are anticipated to provide upfront capital contributions or structured prepayments to support dedicated infrastructure buildout.* These prepayments enhance early-stage liquidity and reduce reliance on dilutive equity or bridge financing. For non-investment grade tenants, we intend to require larger upfront prepayments, third-party credit enhancements, or insurance wrappers to mitigate counterparty risk and preserve underwriting standards. This structured approach to tenant capital participation is designed to strengthen our balance sheet, support project-level debt financing, and align tenant incentives with long-term infrastructure utilization. On November 4, 2025, the Company executed a $150 million Advance in Aid of Construction ("AIAC") Agreement with the First Tenant. The AIAC establishes a cost reimbursement framework under which the tenant will fund a portion of shared infrastructure and utility systems in advance of occupancy.

52.     The 3Q25 10-Q continued to warn of risks with "***could***" or "***may***" impact the Company, as follows, in relevant part:

> *We have not yet constructed our facilities or entered into any binding contracts with any tenants, and there is no guarantee that we will be able to do so in the future. Our limited commercial operating history makes it difficult to evaluate our prospects, the risks and challenges we may encounter and our total potential addressable market. Any delays or setbacks we may experience could have a material adverse effect on our business, financial condition and results of operations, and could harm our reputation.*

> *                 *                 *

> *We may not achieve tenant adoption at the pace or pricing levels required for financial viability.*

53.     The above statements identified in ¶¶48-52 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the Company overstated its tenant demand for its Project Matador campus; (2) the extent to which Project Matador would rely on a single tenant's funding commitment to finance the construction of Project Matador; (3) there was a significant risk that that tenant would terminate its funding commitment; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **The Subsequent Disclosures**

54.     On  December 12, 2025, before the market opened, Fermi revealed the first tenant for the Company's anticipated Project Matador AI campus had terminated its $150 million Advance in Aid of Construction Agreement, which would have supplied construction costs for the facility. Specifically, on that date, the Company issued a press release which stated as follows, in relevant part:

> Fermi Inc. (the "Company") announced in September 2025 that it had entered into a non-binding letter of intent, dated September 19, 2025, with an investment grade-

rated tenant (the "First Tenant") to lease a portion of the Project Matador Site to the First Tenant, subject to negotiation and execution of a definitive lease agreement. The Company announced in November 2025, that the Company and the First Tenant entered into an Advance in Aid of Construction Agreement, dated as of November 3, 2025 (the "AICA"), pursuant to which the First Tenant agreed, subject to certain conditions, to advance up to $150 million to fund construction costs. No funds have been drawn under the AICA. The exclusivity period set forth in the letter of intent expired at midnight on December 9, 2025. Subsequently, the Company commenced discussions with several other potential tenants for power delivery at the Project Matador Site in 2026. ***On December 11, 2025, the First Tenant notified the Company that it is terminating the AICA,*** but the parties continue to negotiate the terms of a lease agreement at Project Matador pursuant to the letter of intent. The Company remains confident that it will be able to meet its expected power delivery schedule at Project Matador as the demand for behind-the-meter power for AI remains robust over the near and long term.

55.    On this news, the Company's stock price fell $5.16 per share, or 33.8%, to close at $10.09 on December 12, 2025, on unusually heavy trading volume.

56.    By the commencement of this action, Fermi stock has traded as low as $8.59 per share, a 59% decline from the $21.00 per share IPO price.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Fermi: (a)  common stock pursuant and/or traceable to the Company's false and/or misleading Registration Statement issued in connection with the Company's IPO; and/or (b)  securities between October 1, 2025 and December 11, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

58.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  The Company sold  37,375,000 shares of  common stock in the IPO. Moreover, record owners and other members of the Class may be identified from records maintained by Fermi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

61.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws was violated by Defendants' acts as alleged herein;

(b)    whether the Registration Statement, statements made by Defendants to the investing public in connection with the Company's IPO, and statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fermi; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

62.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

63.    The market for Fermi's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Fermi's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Fermi's securities relying upon the integrity of the market price of the Company's securities and market information relating to Fermi, and have been damaged thereby.

64.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fermi's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Fermi's business, operations, and prospects as alleged herein.

65.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fermi's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

66.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

67.    During the Class Period, Plaintiff and the Class purchased Fermi's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

68.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue

of their receipt of information reflecting the true facts regarding Fermi, their control over, and/or receipt and/or modification of Fermi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fermi, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

69.     The market for Fermi's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Fermi's securities traded at artificially inflated prices during the Class Period. On October 1, 2025, the Company's share price closed at a Class Period high of $32.53 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Fermi's securities and market information relating to Fermi, and have been damaged thereby.

70.     During the Class Period, the artificial inflation of Fermi's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fermi's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Fermi and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in

Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

71.    At all relevant times, the market for Fermi's securities was an efficient market for the following reasons, among others:

(a)    Fermi shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Fermi filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Fermi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Fermi was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

72.    As a result of the foregoing, the market for Fermi's securities promptly digested current information regarding Fermi from all publicly available sources and reflected such information in Fermi's share price. Under these circumstances, all purchasers of Fermi's securities during the Class Period suffered similar injury through their purchase of Fermi's securities at artificially inflated prices and a presumption of reliance applies.

73.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

74.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fermi who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

77.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

78.     Fermi is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

79.     As issuer of the shares, Fermi is strictly liable to Plaintiff and the Class for the misstatements and omissions.

80.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

81.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

82.     Plaintiff acquired Fermi shares pursuant and/or traceable to the Registration Statement for the IPO.

83.     Plaintiff and the Class have sustained damages. The value of Fermi common stock has declined substantially subsequent to and due to the Defendants' violations.

## SECOND CLAIM
### Violation of Section 15 of the Securities Act
### (Against the Securities Act Individual Defendants)

84.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

85.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

86.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Fermi within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Fermi to engage in the acts described herein.

87.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

88.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## THIRD CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against Fermi and the Individual Defendants

89.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fermi's securities at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

91.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fermi's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

92.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fermi's financial well-being and prospects, as specified herein.

93.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fermi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fermi and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

94.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

95.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fermi's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fermi's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Fermi's securities during the Class Period at artificially high prices and were damaged thereby.

97.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Fermi was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Fermi securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

98.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**FOURTH CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    Individual Defendants acted as controlling persons of Fermi within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    As set forth above, Fermi and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members

of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:   January 5, 2026,                    /s/ Rebecca Dawson

**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff Salvatore Lupia*

## SWORN CERTIFICATION OF PLAINTIFF

## FERMI INC. SECURITIES LITIGATION

I, Salvatore Lupia, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Fermi Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Fermi Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

1/4/2026
_____          _____
Date                                          Salvatore Lupia

**Salvatore Lupia's Transactions in Fermi Inc. (FRMI)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 10/22/2025 | Bought | 40 | $19.3400 |
| 11/13/2025 | Bought | 40 | $19.9550 |
| 11/13/2025 | Bought | 10 | $19.3750 |
| 11/13/2025 | Bought | 50 | $19.4000 |
| 11/13/2025 | Bought | 40 | $18.8700 |
| 11/14/2025 | Bought | 39 | $16.5800 |
| 11/14/2025 | Bought | 1 | $16.5800 |
| 11/20/2025 | Bought | 40 | $16.2000 |
| 11/21/2025 | Bought | 40 | $15.1100 |