

**POLICY OF**

**CONFLICTS OF INTEREST**

**EVER CAPITAL INVESTMENTS, SV, S.A.**



## CONFLICT OF INTEREST POLICY

### DOCUMENTARY RECORD

| Process Owner: | Regulatory Compliance |
|---|---|

| | FECHA | ORGANIZATIONAL UNIT |
|---|---|---|
| Elaborated | 14/07/2025 | Regulatory Compliance |
| Revised | 15/07/2025 | Internal Control |
| Approved | 30/07/2025 | Board of Directors |

### EDIT CONTROL

| FECHA | EDITION | CONCEPT |
|---|---|---|
| 30/07/2025 | V1 Min_ | Policy development |

## INDEX

1. OBJECT, SCOPE AND REGULATORY FRAMEWORK.4

    1.1. OBJECTIVE OF THE POLICY.4

    1.2. SCOPE AND APPLICATION.4

    1.3. APPLICABLE REGULATORY FRAMEWORK.4

    1.4. GENERAL PRINCIPLES OF ACTION.4

2. DEFINITIONS AND KEY CONCEPTS.5

    2.1. DEFINITION OF CONFLICT OF INTEREST.5

    2.2. COMPETENT PERSONS AND RELATED PERSONS.5

    2.3. SEPARATE AREAS AND FUNCTIONS WITH RISK OF CONFLICT.5

    2.4. TYPES OF CONFLICT.6

    2.5. IDENTIFICATION CRITERIA.6

3. CATALOGUE OF POTENTIAL AND ACTUAL CONFLICTS OF INTEREST.7

    3.1. CONFLICTS BETWEEN THE COMPANY AND ITS CUSTOMERS.7

    3.2. CONFLICTS BETWEEN DIFFERENT CLIENTS OF THE COMPANY.7

    3.3. CONFLICTS BETWEEN AREAS OR UNITS OF SOCIETY.8

    3.4. CONFLICTS ARISING FROM PERSONAL TRANSACTIONS.8

    3.5. CONFLICTS WITH RELATED PARTIES AND RELATED PERSONS.8

    3.6. CONFLICTS ARISING FROM INCENTIVES, GIFTS OR INVITATIONS.8

    3.7. CONFLICTS ARISING FROM PRODUCT GOVERNANCE AND REMUNERATION .. 9 3.8. CONFLICTS OVER THE USE OF CONFIDENTIAL OR PRIVILEGED INFORMATION.9

    3.9. CATALOGUE UPDATE.9

4. GENERAL PREVENTION MEASURES.10

5. SPECIFIC CONFLICT MANAGEMENT MEASURES.11

6. RECORDS AND CONTROL SYSTEMS.12

7. RESOLUTION AND ESCALATION PROCEDURE.12

8. TRAINING AND CULTURE OF COMPLIANCE.13

9. RECORDING AND COMMUNICATION SYSTEMS FOR CONFLICTS OF INTEREST RAISED. 13

---

**1. OBJECT, SCOPE AND REGULATORY FRAMEWORK**

**1.1. OBJECTIVE OF THE POLICY**

The purpose of this Conflict of Interest Management Policy is to establish the general principles, criteria and procedures applied by EVER CAPITAL INVESTMENTS, S.V., S.A. (hereinafter, "Company") to identify, prevent, manage and, where appropriate, communicate possible conflicts of interest that may arise in the course of its business, ensuring at all times the primacy of the interests of its clients.

The essential objective of this Policy is to ensure that the organizational structure, internal control mechanisms and measures adopted by the Company are appropriate to its nature, scale and complexity, preventing any potential or actual conflict of interest from harming the interests of customers or the integrity of the market.

**1.2. SCOPE AND APPLICATION**

This Policy applies to all investment and ancillary activities and services provided by the Company, as well as any other complementary or related activities that may give rise to a conflict of interest. Its scope includes all competent persons of the Company (employees, directors, board members, and partners, as well as persons related to the foregoing as defined in applicable regulations).

This Policy also applies to conflicts between the Company and its customers, two or more customers of the Company, and departments of the Company whose activities may conflict.

This Policy is complemented by the Internal Code of Conduct (RIC) and by the specific internal control and authorization procedures, where the operational measures for exclusive application at the internal level are developed.

**1.3. APPLICABLE REGULATORY FRAMEWORK**

- This Policy is approved in compliance with the provisions of current regulations on securities markets and investment services, in particular:
- Law 6/2023, of March 17, on Securities Markets and Investment Services, especially articles 176, 198 and 218, relating to the obligation to have effective organizational and ad ministrative measures to prevent, detect and manage conflicts of interest.
- Royal Decree 813/2023, of November 8, on the legal regime of investment services companies and other entities that provide investment services.
- Delegated Regulation (EU) 2017/565 of 25 April 2016 supplementing Directive 2014/65/EU (MiFID II) with regard to organisational requirements and operating conditions of investment firms, in particular Article 34 thereof.
- CNMV Circular 1/2014, on the internal organization requirements and control functions of entities that provide investment services.

The Company undertakes to keep this Policy permanently updated to reflect regulatory developments, CNMV supervisory recommendations and changes in the Company's structure or activity.

**1.4. GENERAL PRINCIPLES OF ACTION**

The Society operates in accordance with the following guiding principles:

- Primacy of the customer's interest: all actions must be aimed at protecting the customer from any real or potential conflict of interest.
- Independence and objectivity: decisions made in the provision of investment services must be made with full independence from one's own interests or those of third parties.
- Diligence and transparency: professional, honest and equitable management of the interests of all clients will be guaranteed.

---

- Prevention and effective management: organizational and control measures will be applied to prevent conflicts of interest from materializing or, where appropriate, to mitigate their impact.
- Traceability and documentation: all identification, analysis or resolution of a conflict of interest will be duly documented and preserved.
- Communication and training: all competent persons will be informed of the obligations arising from this Policy and trained periodically in compliance with it.

Responsible parties and involved bodies

The ultimate responsibility for compliance with this Policy lies with the Board of Directors, which approves and oversees its implementation and effectiveness.

The RIC Monitoring Body and the Regulatory Compliance Unit are responsible for its effective implementation, coordination, and ongoing supervision, including:

- Identification and updating of the catalog of conflicts of interest.
- Verification of compliance with preventive measures.
- The proposal of improvements or modifications in response to new circumstances.
- The periodic information to the Board of Directors on the results of the supervision.

## 2. DEFINITIONS AND KEY CONCEPTS

### 2.1. DEFINITION OF CONFLICT OF INTEREST

A conflict of interest is considered to be any situation in which the interests of the Company, competent persons or any person acting on its behalf or under its control, may conflict with the interests of one or more clients, or in which the interests of different clients of the Company may oppose each other, generating a significant risk of harm to one of them or to the integrity of the market.

Conflicts of interest can be real, potential or apparent, and can arise from the provision of investment or auxiliary services as well as from other related or complementary activities carried out by the Company.

In all cases, the Company shall adopt the necessary organizational, administrative and control measures to identify, prevent, manage and, where appropriate, communicate their existence to the client in a transparent and timely manner.

### 2.2. COMPETENT PERSONS AND RELATED PERSONS

For the purposes of this Policy, competent persons are considered to be all those who, directly or indirectly, participate in the provision of investment or ancillary services, or in activities that may give rise to a conflict of interest, including:

- The members of the Board of Directors of the Company.
- The partners of the Company, to the extent that they hold a significant stake or exert relevant influence over its management or strategy.
- The directors, employees and agents of the Company.
- Linked agents, if any.
- Natural persons whose services are provided under the control or supervision of the Company or its agents, participating in the provision of investment services.
- Any other external natural or legal person who participates in the provision of services to the Company under a delegation or collaboration agreement, when their actions may generate a conflict of interest.

Also considered as persons linked to the above are those who maintain family, economic or control relationships with them, in accordance with the provisions of article 2.1.j) of Delegated Regulation (EU) 2017/565, and the Internal Code of Conduct.

### 2.3. SEPARATE AREAS AND FUNCTIONS WITH RISK OF CONFLICT



In order to preserve independence and avoid the exchange of sensitive information, the Company identifies and maintains separate areas within its organizational structure. These include, among others, the following:

- Discretionary Portfolio Management Area.
- Markets and Self-Employment Area.

Staff assigned to a separate area may not simultaneously perform functions in another area that could give rise to conflicts of interest.

### 2.4. TYPES OF CONFLICT

The Society has identified the following general types of conflicts of interest that may arise in the course of its activities:

**a) Between the Company and its clients**

- When the Company or a related person can obtain a financial benefit or avoid a loss at the expense of the client.
- When the Company has its own interest in the outcome of a service or operation that is different from the interest of the client.
- When the Company receives incentives or benefits from third parties in relation to a service provided to the client, other than the usual commissions.
- When the Company operates on its own account on the same instruments on which it provides investment services to its clients.

**b) Between different clients of the Company**

- When the Company or a competent person has financial or other incentives to favor the interests of a customer or group of customers to the detriment of others.
- When the Company prioritizes the execution of orders from certain clients over others under equivalent conditions.
- When the allocation of orders or prorations is not carried out under objective and equitable criteria.

**c) Between different areas or organizational units**

- When sensitive information is shared between the Markets and Management areas.
- When the operations desk and the management department interact without respecting the established channels of independence.
- When the remuneration structure or commercial objectives of one area may negatively influence the performance of another.

**d) Between employees, managers or related persons and the Company**

- When employees or managers carry out personal operations in the instruments with which the Company operates as an execution center for their own account or their clients.
- When they maintain financial, family or professional interests with clients, counterparties or suppliers.
- When they accept/pay for gifts, invitations or incentives that may affect their independence.

When they perform external functions or hold significant stakes in companies with which the Company maintains a business relationship.

### 2.5. IDENTIFICATION CRITERIA

To determine whether a situation may constitute a relevant conflict of interest, the Company will apply the following criteria:

- Existence of a real or potential risk of harm to the interests of a client or the market                    ·

- Possibility that the Company or a related person may obtain a direct or indirect benefit as a result of the conflict.

- Degree of influence or control that the person or unit involved can exert over the affected decision.

- Level of economic or reputational materiality of the conflict for the Society or its clients.

Any situation that meets one or more of these criteria will be evaluated by the Regulatory Compliance Unit, which will decide whether to include it in the Catalog of Conflicts of Interest and to adopt preventive or corrective measures.

## 3. CATALOGUE OF POTENTIAL AND ACTUAL CONFLICTS OF INTEREST

The Company maintains an up-to-date catalog of potential and actual conflicts of interest, i dentified based on the nature of the investment services it provides and its organizational structure. This catalog aims to prevent and manage conflicts that may arise between:

- Society and its clients,
- different clients of the Company, or
- the different areas or competent people within the organization itself.

The main categories of conflicts identified are detailed below.

### 3.1. CONFLICTS BETWEEN THE COMPANY AND ITS CUSTOMERS

The following cases, among others, may occur:

- When the Company or a related person can obtain a financial benefit or avoid a loss at the expense of the client.

- When the Company has its own interest in the outcome of a service or operation other than the client's interest in that outcome.

- When the Company operates on its own account as an execution center on the same OTC fixed income financial instruments in which it provides investment services to its clients.

- When the Company receives or grants incentives, benefits or remuneration from third parties linked to customer transactions.

- When the Company recommends or executes operations that benefit entities or counterparties with which it maintains commercial or participatory links.

- When the Company uses information obtained within the framework of the relationship with a client for its own benefit or that of another client.

### 3.2. CONFLICTS BETWEEN DIFFERENT CLIENTS OF THE COMPANY

Among the main assumptions:

- When the Company can favor the interests of one client or group of clients over those of others in equivalent situations.

- When there is unequal allocation or proration of operations or prices between managed portfolios.



- When the Company prioritizes the execution of orders from certain clients or portfolios to the detriment of others.

- When a professional or institutional client receives more favorable treatment than a retail client under conditions that are not objectively justified.

- When the Company manages portfolios with opposing strategies, generating conflict between the investment decisions of different clients.

### 3.3. CONFLICTS BETWEEN AREAS OR UNITS OF SOCIETY

EThese conflicts can arise from interactions between separate areas or from the organizational structure.  :

- When there is an undue exchange or influence of information between the Management area and the Markets or Own Account area.

- When the dealing desk acts as a counterparty in client transactions or managed portfolios.

- When the remuneration structure or the objectives of an area incentivize behaviors contrary to the interests of customers.

- When there is duplication of functions or lack of independence between management and execution activities.

### 3.4. CONFLICTS ARISING FROM PERSONAL TRANSACTIONS

In accordance with the provisions of the Internal Regulations of Conduct (RIC), conflicts may arise when competent persons or their associates:

- Carry out operations on the same OTC fixed income financial instruments in which the Company operates as an execution center for its own account or for its clients.

- Have relevant or confidential information that could be used for their own benefit.

- Carry out activities or maintain holdings in entities with which the Company maintains professional or commercial relationships.

### 3.5. CONFLICTS WITH RELATED PARTIES AND RELATED PERSONS

Operations or relationships maintained with the following are considered potential conflicts of interest:

- Administrators, partners, directors or employees of the Company.
- Entities or persons with close links or control relationships.
- Suppliers, counterparties or intermediaries with whom there is a relevant economic or personal relationship.

In these cases, the Company will ensure that the decisions taken respond to the exclusive interest of the client, and that the conditions are equal to or better than those of the market, maintaining documentary traceability and prior approval where appropriate.

### 3.6. CONFLICTS ARISING FROM INCENTIVES, GIFTS OR INVITATIONS

- When the Company or its employees receive or provide payments, benefits or non-monetary advantages that may influence their independence.



- When a gift or invitation, even if of limited value, may be perceived as an attempt to i nfluence a professional decision.

- When there are cross-incentives between the Company and its counterparties that may condition the selection of products or the execution of orders.

The Society has a specific Gifts and Invitations Policy, which sets out the limits and requirements f or communication.

### 3.7. CONFLICTS ARISING FROM PRODUCT GOVERNANCE AND REMUNERATION

- When the design or marketing of a product does not adequately fit the defined target market.

- When the remuneration policy generates incentives that may prioritize commercial interests over those of the customers.

- When products or services are offered with a higher profitability for the Company, to the detriment of the suitability or convenience for the customer.

These conflicts are managed in an integrated manner through the Company's Product Governance Policy and Remuneration and Incentives Policy.

### 3.8. CONFLICTS DUE TO EXTERNAL ACTIVITIES OR PERSONAL INTERESTS

They can arise when a competent person:

- Performs external positions, paid or unpaid, in companies with related or concurrent activity.
- Holds significant stakes in companies with which the Company maintains commercial or investment relationships.
- Maintains family or professional relationships that may influence their performance or independence.

These situations must be reported to the Regulatory Compliance Unit and, where appropriate, authorized or limited in accordance with internal regulations.

### 3.9. CONFLICTS OVER THE USE OF CONFIDENTIAL OR PRIVILEGED INFORMATION

Serious conflicts arise from the misuse or disclosure of confidential or privileged information, particularly when:

- This information is used for the benefit of oneself or third parties.
- Shared outside the authorized functional scope.
- Investment or advice decisions are made based on non-public information.

These behaviors are expressly prohibited and sanctioned in the Internal Code of Conduct and in the applicable regulations on market abuse.

### 3.10. CATALOG UPDATE

The Society will periodically review and update the list of conflicts of interest, especially when:



- New services, products or counterparties are incorporated.
- Relevant organizational or technological modifications occur.
- New types of conflicts may arise as a result of internal supervision or regulatory requirements.

The updated catalog will be integrated into the Register of Conflicts of Interest maintained by the Regulatory Compliance Unit, which is reviewed quarterly and incorporated into the periodic Regulatory Compliance report.

## 4. GENERAL PREVENTION MEASURES

The Company applies a set of organizational and internal control measures designed to identify, prevent, and effectively manage conflicts of interest, guaranteeing at all times the independence, objectivity, and fairness in the provision of its investment services. These measures are based on the principles established in Articles 176 and 198 of Law 6/2023 of 17 March, on Securities Markets and Investment Services, Article 34 of Delegated Regulation (EU) 2017/565, and CNMV Circular 1/2014, always taking into account the nature, scale, and complexity of the Company's activity.

The Company's organizational structure is designed to preserve independence of judgment in all decisions that may be affected by conflicting interests. To this end, the functions and responsibilities of each area have been clearly defined, establishing distinct hierarchical lines and effective information barriers between the management, markets, and control areas. This ensures functional segregation, confidentiality of information, and the prevention of undue influence between departments.

The identification of conflicts of interest is carried out continuously, both proactively and reactively, in the monitoring of ongoing operations and activities. The Company analyzes potential conflicts arising from the economic, personal, or professional interests of competent individuals, relationships with clients, counterparties, or related entities, as well as interactions between operational areas and the incentive or compensation structure. Any situation that may involve a conflict is documented in the Conflict of Interest Register, specifying its nature, assessment, and the measures taken to mitigate it.

The preventive management of these risks is based on a series of structural principles: the professional independence of the business areas, the control of access to sensitive information, the prior review by the Regulatory Compliance Unit of those operations or decisions likely to generate conflicts, and the documentation and traceability of all relevant processes.

When, despite the application of these measures, it is not reasonably possible to guarantee that a conflict of interest will be eliminated or effectively managed, the Company will inform the client clearly, completely, and promptly about the nature and origin of the conflict before providing the corresponding service. This communication, which will be made in writing or through secure electronic means, will allow the client to make an informed decision, without exempting the Company from continuing to apply all necessary measures to protect its interests.

The Company actively fosters a culture of compliance and integrity through initial and ongoing training for all competent personnel in professional conduct, conflict management, and independence. These training programs, tailored to each individual's level of responsibility, aim to reinforce ethical commitment and individual accountability in conflict prevention. Furthermore, the Compliance Unit maintains constant communication with staff, disseminating regulatory updates, reminders of obligations, and best practices.

Finally, the effectiveness of these measures is subject to continuous monitoring by the Compliance Unit, in coordination with the RIC Monitoring Body. Both bodies periodically review compliance with this Policy, evaluate the implemented measures, and verify the proper updating of the conflict of interest register and catalog. The results of this monitoring are reported to the Board of Directors through Compliance Reports. Furthermore, the Policy is reviewed at least once a year, or immediately when significant changes occur in the Company's structure, activities, or applicable regulations.

## 5. SPECIFIC CONFLICT MANAGEMENT MEASURES

The Company has established a framework for effectively managing identified or potential conflicts of interest, ensuring the traceability of all actions and the adequate protection of clients' interests. These measures are applied independently of the general provisions set forth in the Internal Code of Conduct (ICC), which details the internal control and authorization procedures at the operational level.

When a potential conflict of interest is detected, the RIC Monitoring Body, in coordination with the affected departments, analyzes its nature, scope, and potential impact on clients or market integrity. This analysis determines whether the conflict can be avoided, managed, or ultimately reported. In all cases, the actions taken are documented and recorded to ensure traceability and subsequent review by the competent authorities.

In cases where it is possible to prevent a conflict from arising, the Company takes the necessary steps to eliminate its root cause. These may include modifying an operational decision, reassigning responsibilities, or implementing additional information barriers. When complete elimination is not possible, management and mitigation measures are applied to ensure that the final decision is made based on objective criteria, solely in the best interests of the clients, and in accordance with the principle of professional independence.

All actions related to a conflict of interest are recorded in the Conflict of Interest Register, which includes detailed information on its identification, analysis, measures taken, and outcome. This register is kept permanently updated and is reviewed by the Compliance Unit as part of its periodic audits.

If a identified conflict of interest could have a significant impact and there are insufficient measures in place to mitigate it, the Company will expressly inform the affected client before providing the service or executing the transaction. This communication will include the nature, origin, and implications of the conflict, as well as the measures taken to mitigate it. This transparency aims to enable the client to make an informed decision about whether to proceed.

or not with the proposed transaction. In any case, communicating with the client is a last resort and does not exempt the Company from applying the necessary organizational and administrative measures to prevent the conflict from harming its interests.

The resolution of conflicts of interest is always carried out under the supervision of the RIC Monitoring Body when the situation so requires due to its complexity or significance. In the most significant cases, the matter is referred to the Board of Directors, which makes the final decision, ensuring that it acts in the best interests of clients and in accordance with the principles of independence and transparency. The head of the affected area may not participate in the voting during the Board of Directors' deliberations.

Furthermore, the Company has established internal communication channels so that competent persons can confidentially report any circumstance that they consider likely to generate a conflict of interest.

## 6. RECORDS AND CONTROL SYSTEMS

The Company maintains a Register of Conflicts of Interest in which all identified situations that may actually or potentially involve a conflict of interest between the Company, its competent personnel, or its clients are documented. This register is an essential tool for ensuring traceability, transparency, and ongoing monitoring of the internal control system.

Each entry in the log records, in a structured manner, a description of the identified situation, the analysis performed, the measures taken to prevent or manage the conflict, and the final outcome of the action. In addition, it indicates the date of detection, the person or area affected, and the level of potential or actual impact, allowing for effective and documented tracking of all incidents.

The RIC Monitoring Body is responsible for updating, maintaining, and overseeing the register, ensuring that its content accurately reflects the current status of identified conflicts. The register is reviewed quarterly as part of the regulatory compliance monitoring reports, and the results are presented to the Board of Directors, along with the conclusions and recommendations derived from the analysis.

The Company guarantees the integrity and traceability of all information included in the register. To this end, complete documentary evidence is maintained for each case, including reports, communications, authorizations, and decisions adopted. This documentation is archived primarily electronically, with appropriate security, confidentiality, and access control measures, ensuring its availability to the CNMV (Spanish National Securities Market Commission) or any internal or external audit that may require it.

## 7. RESOLUTION AND ESCALATION PROCEDURE

The Company has a clear procedure for managing and resolving conflicts of interest that may arise in its activities.

When a competent person detects a potential conflict of interest, they must immediately report it to the Compliance Unit, which analyzes the case and decides on the appropriate measures. These measures may include



This may include reassigning functions, independent review of operations, or implementing additional controls.

If the conflict is significant or affects members of senior management, it is referred to the RIC Monitoring Body and, ultimately, to the Board of Directors, which makes the final decision always guaranteeing the client's interest.

In cases where it is not possible to completely eliminate the conflict, the Company will inform the client before providing the service, describing the nature and origin of the conflict and the measures taken to mitigate it.

The entire process is documented in the Register of Conflicts of Interest, ensuring its traceability and subsequent control.

## 8. TRAINING AND CULTURE OF COMPLIANCE

The Company believes that a strong compliance culture and ongoing professional development are essential to ensuring ethical and transparent conduct that acts in the best interests of its clients. To this end, all competent personnel will receive regular training in conflict of interest management.

The RIC Monitoring Body is responsible for planning and coordinating these programs, reviewing their content at least once a year to incorporate regulatory changes or recommendations from the CNMV (Spanish National Securities Market Commission). It also promotes ongoing awareness through internal communications, reminders, and specific sessions on best practices and professional ethics.

The Company fosters an environment where regulatory compliance is a shared responsibility, integrated into daily operations and decision-making. Ethical behavior, independence of judgment, and prioritizing the customer's interests are essential principles guiding the actions of everyone within the Company.

## 9. RECORDING AND COMMUNICATION SYSTEMS FOR CONFLICTS OF INTEREST RAISED.

The RIC Monitoring Body will be responsible for maintaining an up-to-date "register" of conflicts of interest that have occurred or are occurring on an ongoing basis. This register will have the following structure:

**Register of conflicts of interest.**

| Nº | Origin date | Area / Person affected | Description of the conflict | Nature | Measures taken or recommended | Date resolution | Communication to customer | Observations/Follow-up |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| .... | | | | | | | | |

All conflicts of interest that arise within the organization will be referred to the RIC Monitoring Body, which is responsible for maintaining and updating the register of conflicts of interest.